United States District Court
Southern District of Texas
**ENTERED**
September 21, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| | § | |
| **V.** | § | **CRIMINAL CAUSE NO. 4:23-cr-204-23** |
| | § | |
| **EDGAR BENAVIDES,** | § | |
| ***Defendant.*** | § | |
| | § | |
| | § | |
| | § | |

**ORDER ON DEFENDANT EDGAR BENAVIDES'S MOTION TO SUPPRESS**

Before the Court is Defendant Edgar Benavides' Motion to Suppress Evidence obtained through canine "open air sniffs" and custodial interrogation in violation of the Fourth and Fifth Amendments to the United States Constitution. After considering the Motion, all responses and replies, parties' oral arguments, supplemental briefing, and the applicable law, the Court concludes that Motion should be **GRANTED IN PART AND DENIED IN PART.**

## I. BACKGROUND

Defendant moves to suppress evidence obtained through open-air canine sniffs of his vehicle and interviews with special agents after he was Mirandized. The following facts describe the sequence of events and are not disputed unless otherwise indicated.

### *A. Traffic Stop and Open-Air Canine Sniffs*

In May 2017, the Laredo Division Office of the Drug Enforcement Administration (DEA) and Homeland Security Investigation (HSI), began an investigation into the illegal drug trafficking

activities of a Drug Trafficking Organization (DTO) responsible for coordinating the transportation of multi kilogram quantities of cocaine and marijuana from Monterrey, Nuevo Leon, Mexico to Nuevo Laredo, Tamaulipas, Mexico into Laredo, Texas and further to other United States cities. ECF No. 893. On May 23, 2019, DEA agents conducted and undercover investigation in Laredo, Texas, during which, DEA Special Agent (SA) Manuel Aranda conversed with Defendant about an alleged drug deal. *See id.* at 2-3 (describing undercover investigation). Based on these conversations, DEA agents established surveillance around 1101 Beltway Parkway and obtained a visual of a gold Nissan Maxima, which they believed to be Mr. Benavides's car. *See id.* at 3.

On May 24, 2019, at 8:11 A.M., Dep. Gerardo Martinez of the Webb County Sheriff's Office observed Defendant's "vehicle drive at a high rate of speed" in violation of Texas Transportation Code § 545.423. ECF No. 870 at 2 (quoting Webb County Sheriff's Office Incident Report, DEA Report of Investigation at *4). HSI SA Lori Robinson states that she also personally observed the vehicle commit the traffic violation.[1] *See* ECF No. 893 at 4. Dep. Martinez pulled Defendant over and began an investigation. *See* ECF No. 870 at 1-2. He asked twice for voluntary consent to search the vehicle, which Defendant denied. *Id.* at 2. Defendant admitted that he was driving without a driver's license, so Dep. Martinez informed him that his vehicle could be impounded for driving without a license. *See* ECF No. 893 at 5. Dep. Martinez then asked dispatch for a canine unit to come to the scene to conduct an open-air sniff of the vehicle. ECF No. 870 at 2. While this occurred, HSI SA Mark Rocha separately contacted U.S. Border Patrol to request a

[1] Defendant's Motion does not state that HSI investigators surveilled the traffic violation; however, it does not directly dispute this fact. *See* ECF No. 870 at 2.

Narcotics and Human Detection Dog (NHDD). *See* ECF No. 893 at 4. Dep. Martinez and SA Rocha did not coordinate their requests for canine detection dogs. *Id.*

At around 8:39 A.M. Laredo Police Department Officer Estrada arrived on the scene with a canine in response to Dep. Martinez's request. ECF No. 870 at 3. Officer Estrada conducted an open-air sniff with the canine and confirmed that the canine did not identify the presence of narcotics. *Id.* Dep. Martinez instructed Defendant to stay where he was standing on the roadside while he contacted the DEA and HIS agents that were involved in the investigation that the canine did not alert them to the presence of drugs. *Id.*; ECF No. 893 at 6. According to the government, the agents told Dep. Martinez that they had independent probable cause. ECF No. 893 at 6.[2] After this conversation, Dep. Martinez consented to keep Defendant in custody for a few minutes. *Id.*; ECF No. 870 at 3-4. Dep. Martinez communicated that, without Defendant's consent or an alert from the canine, he would likely have to let him go, but he contacted his supervisor from his patrol vehicle to report Defendant's suspended license and inquire about impounding his v ehicle. ECF No. 893 at 6; ECF No. 870 at 4.

At this time, around 8:50 A.M., U.S. Border Patrol Agent Charles Mellado arrived on the scene with his canine, Zara, who had been previously requested by HSI SA Rocha during the initial traffic stop. *Id.* Zara conducted a second open-air sniff and alerted to the trunk of the Defendant's vehicle. ECF No. 893 at 7; ECF No. 870 at 4. Dep. Martinez allegedly advised Mr. Benavides that the canine's alert provided him probable cause to search the vehicle, but he denied knowledge of the vehicle's contents. *See* ECF No. 893 at 7. Dep. Martinez proceeded with the search, discovering

---

[2] Defendant does not attest to these facts in his Motion to Suppress; however, he does not explicitly dispute them. ECF No. 870.

fifteen bundles of cocaine, with a total weight of approximately 15.5 kilograms. *Id.*; ECF No. 870 at 4.

*B. Defendant's Miranda Rights and Subsequent Questioning*

Defendant was placed under arrest and taken to Webb County Sheriff's substation, where he spoke with HSI SAs Vasquez, Robinson, and Wasmund in the station's interrogation room. ECF No. 893 at 7; ECF No. 870 at 4. The cameras in the interrogation room in which Benavides spoke with the agents were not on; as such, the interactions were not recorded. ECF No. 870 at 4. SA Vasquez read Defendant his Miranda warnings. ECF No. 893 at 7; ECF No. 870 at 4-5 (quoting DEA Report of Investigation). Mr. Benavides stated that he preferred to consult with an attorney before providing any information, and the agents confirmed that they understood his invocation of the right. ECF No. 893 at 7; ECF No. 968 at 1.

However, the agents did not provide him with an attorney. *See* ECF No. 962 at 12. Instead, they informed Defendant that he would be released that day. *See id.*; ECF No. 893 at 7. Defendant expressed that he "did not understand why he would be released." ECF No. 962 at 12 (quoting SA Vasquez's testimony); ECF No. 893 at 7. SA Vasquez informed him that the agents were at liberty to arrest him at a later date, but that Defendant would be released on that particular day. *Id.*; ECF No. 962 at 12. Defendant still did not understand this, but the agents communicated that this would be his opportunity to provide useful information. *See* ECF No. 962 at 12 (explaining that Defendant did not understand even after SA Vasquez informed him he would be released later that day); ECF No. 893 at 7 ("Agents then informed Benavides that he would be released that day and that it was his opportunity to provide useful information.").

Mr. Benavides stated that he was willing to provide information at this time and shared that he was being paid $50 per bundle of cocaine for pickup and delivery in Laredo, TX. *See* ECF No. 893 at 7. He further confirmed that he was operating a cocaine stash house directed by Antonio Fonseca, also known as "Pelon." *Id.*

## II. LEGAL STANDARD

### *A. Warrantless Search and Seizure*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. "As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 573 U.S. 373, 381 (2014) (internal quotations omitted). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Evidence derived from an illegal search or seizure must be excluded. This exclusion serves a deterrent purpose. "Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct." *Terry v. Ohio*, 392 U.S. 1, 12 (1968). Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992). However, in cases where a search is not conducted pursuant to a warrant, the government bears the burden of proving that the search was lawful. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

One exception to this exclusionary rule permits "a warrantless search of a readily mobile vehicle . . . when law enforcement has probable cause to believe the vehicle contains contraband or evidence of a crime." *United States v. Riojas*, 139 F.4th 465, 474 (5th Cir. 2025) (quoting *United States v. Clayton*, 98 F.4th 256, 261 (5th Cir. 2024)). "A law enforcement officer has 'probable cause to conduct a search when the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present.'" *See Clayton*, 98 F.4th at 263 (quoting *Florida v. Harris*, 568 U.S. 237, 243, 133 S. Ct. 1050, 18 L.Ed.2d 61 (2013)). Probable cause to make a traffic stop can also exist when a law enforcement officer observes a defendant commit a traffic violation. *See United States v. Rosales-Giron*, 592 F. App'x 246, 251 (5th Cir. 2014) (unpublished). Further, "[i]t is not necessary that the arresting officer himelf have personal knowledge of all of the facts . . . [P]robable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest, when there is some degree of communication between the two.'" *United States v. Kye Soo Lee*, 962 F.2d 430, 435-36 (5th Cir. 1992) (quoting *United States v. Ashley*, 569 F.2d 975, 983 (5th Cir.), *cert. denied*, 439 U.S. 853, 99 S. Ct. 163, 58 L.Ed.2d 159 (1978)).

Another such exception, known as the "inevitable discovery rule" permits the admission of evidence obtained through an unlawful warrantless search and seizure if that evidence would have otherwise been discovered through a "'later, lawful seizure' that is 'genuinely independent of an earlier, tainted one.'" *See Hudson v. Michigan*, 547 U.S. 586, 616, 126 S. Ct. 2159, 165 L.Ed.2d 56 (2006) (quoting *Murray v. United States*, 487 U.S. 533, 542, 108 S. Ct. 229, 101 L.Ed.2d 472 (1988)). For the inevitable discovery exception to apply, "the Government must prove by a preponderance of the evidence that '(1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct, and

(2) the Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation.'" *See United States v. Hastings*, 246 F. Supp.3d 1163, 1167-68 (E.D. Tex. 2017) (quoting *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir. 1991)).

*B. Miranda Interrogations*

The Fifth Amendment of the U.S. Constitution "forbids law enforcement from using statements, 'whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *See United States v. Rider*, 94 F.4th 445, 454 (5th Cir. 2024) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966)); *see also* U.S. CONST. AMEND. V. Once a suspect invokes his right to counsel, law enforcement officers cannot initiate interrogation "until either counsel is made available or a suspect initiates further communication himself." *See United States v. Solis*, L-09-596, 2009 WL 1758745, at *2 (S.D. Tex. Jun. 19, 2009); *see also Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 1885, 68, L.Ed.2d 378 (1981).

For the purposes of the *Miranda* inquiry, a suspect is "in custody" when he is placed under formal arrest or "when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988); *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015). This is an objective inquiry, requiring courts to analyze whether, under the totality of the circumstances, a *reasonable* person would consider themselves to be restrained. *See Wright*, 777 F.3d at 774-75. Among other factors, courts determine whether a suspect was in custody by considering "(1) the length of the questioning . . .; (2) the

location of the questioning . . .; (3) the accusatory, or non-accusatory, nature of the questioning . . .; (4) the amount of restraint on the individual's physical movement . . .; [and] (5) statements made by officers regarding the individual's freedom to move or leave . . . ." *Id.* at 775 (internal citations omitted); *see also United States v. Coulter*, 41 F.4th 451, 457 (2022) (stating factors to determine whether suspect was in custody).

Interrogation refers to "any words or actions on the part of the police . . . that the police should know are reasonably likely to evoke an incriminating response from a suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301,100 S. Ct. 1682, 64 L.Ed.2d 297 (1980); *see also United States v. Maldonado*, 213 F. Supp.2d 710, 717 (S.D. Tex. 2002) (applying *Innis* standard). This concept applies both to explicit interrogation and its "functional equivalent." *Innis*, 446 U.S. 291 at 300-01. "This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Id.* at 301. Therefore, it is appropriate for courts to consider the subjective perception of the suspect—if the person in custody was likely to believe that law enforcement officers' actions were designed to evoke an incriminating response, then the suspect is considered to have been subjected to interrogation. *See id.* (finding the definition of functional interrogation "focuses primarily upon the perceptions of the suspect, rather than the intent of the police"). Law enforcement officers' perceptions of their own actions are only relevant to the extent that it shows whether the officers should have known that their words or actions were likely to evoke an incriminating response. *Id.* at 301 n.7; ECF No. 969. "[S]ubtle compulsion," consisting of a "few off hand remarks" which prompt a suspect to provide an incriminating response do not constitute interrogation. *Innis*, 446 U.S. at 303.

## III. DISCUSSION

For the reasons that follow, the Court finds that evidence collected as a result of the open-air sniff must not be suppressed. However, evidence of Defendant's confession after invoking his right to counsel violate the Fifth Amendment of the U.S. Constitution, and therefore must be suppressed.

*A. Deputy Martinez Had Probable Cause to Stop Defendant's Car and Conduct the Second Open Air Search.*

Evidence collected as a result of Dep. Martinez's traffic stop and subsequent searches will not be suppressed. First, Dep. Martinez had probable cause to stop Defendant's car. Although he lacked a warrant to seize the vehicle, he witnessed Mr. Benavides commit several traffic violations, including exceeding the speed limit. *See Rosales-Giron*, 592 Fed. App'x at 251 (finding probable cause to make a traffic stop exists when a law enforcement officer observes traffic violation). Immediately after pulling him over and conducting the first open-air sniff, Dep. Martinez did not have probable cause to conduct a second sniff; however, the events that followed allowed Dep. Martinez to develop probable cause.

After questioning Defendant, Dep. Martinez determined that he did not have a valid driver's license. ECF No. 893 at 5. This led Dep. Martinez to contact his supervisor to determine whether to impound the car. *Id.* Through this process, Dep. Martinez was connected with the HIS and DEA agents conducting the investigation; they informed Dep. Martinez that they had independent probable cause which merited a second open-air sniff. *Id.* at 6. Although Dep. Martinez did not have personal knowledge of the investigation which allowed him to develop probable cause, he relied on the assertions of the other agents to determine that probable cause existed. *See Kye Soo Lee*, 962 F.2d at 435. The phone calls with his supervisor and the HIS and DEA agents constitutes "some degree of communication" which therefore allowed Dep. Martinez

to rely on the collective knowledge of his peers in law enforcement. *Id.*; *Ashley*, 569 F.2d at 893 (finding that probable cause based on collective knowledge exists when there is "some degree of communication" between the arresting officer and the officer with probable cause).

Defendant contends that, because Dep. Martinez did not communicate with the federal agents until after stopping him and conducting the first open-air sniff, the collective knowledge theory is inoperable. ECF No. 870 at 17 ("[T]he Collective Knowledge Throey does not apply because the Federal law enforcement agents . . . did not communicate . . . until after the traffic stop was underway.") Had Dep. Martinez relied on the collective knowledge of the federal agents to stop Mr. Benavides's car and conduct the first open-air sniff, this argument might have succeeded, as Dep. Martinez would not have developed probable cause until after engaging in the objected-to behavior. However, an officer can learn new information in the midst of a legal traffic stop which causes them to develop probable cause to search the vehicle, even if the stop is already underway. *See, e.g.*, *United States v. Spears*, 636 Fed. App'x 893, 898-99 (5th Cir. 2016) (finding that officer developed probable cause to search for drugs even though he only had personal knowledge of a traffic stop because DEA agents informed him of drug investigation). *United States v. Lork*, 132 Fed. App'x 34, 35 (5th Cir. 2005) (finding that officer developed probable cause while traffic stop was underway because he smelled marijuana emanating from vehicle); *United States v. Duffaut*, 314 F.3d 203, 208 (5th Cir. 2002) (finding officer developed probable cause while traffic stop was underway because drug-sniffing dogs alerted to presence of narcotics).

Regardless of whether Dep. Martinez had probable cause to conduct the second open-air sniff, the evidence of the cocaine in Mr. Benavides's car would still be admissible under the inevitable discovery doctrine. Because Dep. Martinez identified that Defendant lacked a valid driver's license, he was communicating with his supervisor about the possibility of impounding

the vehicle and taking it back to the station. *See* ECF No. 893 at 5. This "later, lawful seizure" would have been "genuinely independent" from the search Dep. Martinez conducted as a result of his communication with DEA and HSI agents, as the issue of whether Defendant drove a car without a valid driver's license bears no relationship to whether he was transporting drugs. *See Murray*, 487 U.S. at 542, 108 S. Ct. 229, 101 L.Ed.2d 472; *Lamas*, 930 F.2d at 1102 (finding that evidence admitted under the inevitable discovery exception must be related to a "substantial alternate line of investigation at the time of the constitutional violation"). Because it is customary for officers to impound vehicles if they find that driver is operating without a license, and later to search impounded vehicles, there is a "reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct." *See Lamas*, 930 F.2d at 1102. Therefore, the evidence must not be suppressed even if Dep. Martinez lacked probable cause.

B. *HSI SAs Vasquez, Robinson, and Wasmund's Questioning of Defendant After He Invoked His Right to Counsel Violated His* Miranda *Rights.*

After Defendant's arrest and invocation of the right to counsel, the statements he made to SAs Vasquez, Robinson, and Wasmund were the result of improper custodial interrogation; therefore, they must be suppressed. *See Rider*, 94 F.4th at 454.

First, Defendant was in custody for the purposes of the *Miranda* inquiry. Although Mr. Benavides was not questioned for a long time before he invoked his right to counsel, the circumstances surrounding his interactions with the special agents indicate that he was in custody. *See Wright*, 777 F.3d at 774-75 (explaining that whether defendant was in custody is inquiry based on the totality of the circumstances). Perhaps most notably, Defendant was questioned in the Sheriff Station's interrogation room. *See* ECF No. 893 at 7; ECF No. 870 at 4. The pressures

associated with that sort of physical space would lead a reasonable person to believe that his movement was restrained in a way that was akin to a formal arrest. *See Wright*, 777 F.3d at 774-75 (describing the location of the interrogation to be a key indicator of custody); *Bengivenga*, 845 F.2d at 596 (finding defendant is in custody if a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."). Similarly, as Defendant was formally under arrest, his movement was significantly restrained. *See Wright*, 777 F.3d at 774-75 (describing the level of restraint to be a key indicator of custody).

The Government contends that, because the agents had ceased questioning of Defendant and indicated that he would be released, that he was not in-custody. *See* ECF No. 969 at 13. While it is true that the agents were no longer asking him questions, they still made statements which were accusatory in nature and which constituted interrogation for the purposes of *Miranda*. *See id.* (finding that the "accusatory, or non-accusatory, nature of the questioning" is a factor in determining custody); *see also Innis*, 446 U.S. at 303 (describing interrogation as those actions which are "reasonably likely to evoke an incriminating response). For one, while the agents had told Mr. Benavides that he would be released later that day, they expressly reserved the right to re-detain him in the future and stated that this would be his chance to provide helpful information. *See* ECF No. 893 at 7. By intimating that a future arrest was possible, or even probable, the agents made it seem that this was Mr. Benavides's only chance to circumvent the future arrest by providing "helpful" information. *Id.* This, in combination with the fact that Mr. Benavides was clearly confused as to his arrest status, indicates that the agents should have known that their words were likely to elicit an incriminating response. *See id.* (finding the definition of functional interrogation "focuses primarily upon the perceptions of the suspect" and the only inquiry as to

the police's mindset is to determine whether the police should have known that the defendant would find their actions coercive); *see also* ECF No. 962 at 12 (describing Defendant's confusion).

These statements made by the agents here are more serious in scope than the "subtle compulsion" at issue in *Innis*. There, patrolmen arrested Defendant on a firearm-related charge; while driving with Defendant in the backseat, they had a conversation between themselves about their concerns over children finding and using the weapons. *Innis*, 446 U.S. at 294-95. The defendant then interrupted the conversation and, although he had already invoked his right to counsel, stated that he would show them where the weapons were located. *See id.* at 295. The *Innis* Court found that the conversation between the two officers merely amounted to "subtle compulsion," as the officers would not have reasonably known that a short conversation they had in the defendant's presence, which did not involve his participation, would compel him to speak. *Id.* at 33 ("Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect."). In the instant matter, however, SAs Vasquez, Robinson, and Wasmund, spoke directly to Mr. Benavides about the probability of his future arrest. *See* ECF No. 893 at 7. Rather than speaking about hypothetical harms which might befall unknown personages between themselves, as the patrolmen did in *Innis*, the agents explicitly reserved the right to arrest Defendant in the future and prompted him to speak by saying that he had the opportunity to provide helpful information. *Id.*; *Innis*, 446 U.S. at 294-95. Although they had stated that he would be released later that day, their purpose in asking him to provide any "helpful" information was to make him speak in that moment. *Id.* Therefore, the statements made by the agents were interrogatory and accusatory in nature.

Finally, although Agent Vasquez said that Defendant would be released later that day, he was decidedly not released at the moment in which he made the incriminating statements. *See id.*; ECF No. 893 at 7. Although he "would be" released later that day, Defendant was still subject to the restraints on his movement which would indicate to him that he was in custody. *See Wright*, 777 F.3d at 774-75. A reasonable person who was under arrest, sitting in an interrogation room, and being told that he might be re-arrested in the future, would believe themselves to be subject to the typical restraints of a custodial interrogation, even if they knew that they would be released in the future. *See Bengivenga*, 845 F.2d at 596.

In sum, Mr. Benavides was subject to custodial interrogation after invoking his right to counsel when SAs Vasquez, Wasmund, and Robinson questioned him. Therefore, the incriminating statements he made as a result of this interrogation must be suppressed.

## IV. CONCLUSION

For the reasons stated, the Motion to Suppress is **GRANTED IN PART AND DENIED IN PART.** The evidence obtained as result of the open-air sniff will not be suppressed, but the statements obtained as a result of the in-custody questioning must be **SUPPRESSED.**

Signed at Houston, Texas on September 21, 2026.

Keith P. Ellison
United States District Judge